IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2018 Session

## CHRISTOPHER LEWIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Putnam County**
No. 10-0875     David Alan Patterson, Judge

_____

**No. M2017-01386-CCA-R3-PC**
_____

The Petitioner, Christopher Lewis, appeals from the Putnam County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance from his trial counsel because trial counsel (1) failed to call several witnesses at trial; and (2) failed to introduce evidence "of the weather during the weekend" of the victim's death and "additional evidence . . . regarding . . . a large hole" in the backyard of the Petitioner and victim's home. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Loretta G. Cravens, Knoxville, Tennessee (on appeal); and Robert L. Sirianni, Jr., Winter Park, Florida (at post-conviction hearing), for the appellant, Christopher Lewis.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Beth Elana Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

### I. Trial Proceedings

The Petitioner was convicted of second degree murder for the killing of his wife, Amy Lewis, "whose body was found inside the couple's home on August 1, 2010." State v. Christopher Lewis, No. M2013-00212-CCA-R3-CD, 2013 WL 6199278, at *1 (Tenn.

Crim. App. Nov. 27, 2013), perm. app. denied (Tenn. Apr. 10, 2014).  The trial court imposed a fifteen-year sentence for the conviction.  Id.  A panel of this court affirmed the Petitioner's conviction on direct appeal.[1]  Id.  Our supreme court declined to review this court's opinion on April 10, 2014.

The evidence at trial established that the Petitioner and the victim had been married for seventeen years and had four children together.  Lewis, 2013 WL 6199278, at *2.  On July 31, 2010, the victim was "scheduled to be at work at 7:00 a.m."  Id. at *5.  She typically "was at work fifteen to thirty minutes early," but "she did not show up at work at all" that day.  Id.  A concerned co-worker "called the victim approximately ten times and never received an answer."  Id.  The Petitioner's mother, Margaret Lewis, lived a short distance from the Petitioner and the victim's trailer and testified that she heard the victim "'yelling for the dogs'" on the morning of July 31, 2010.[2]  Id. at *3.

What happened next was contested at trial.  Margaret testified that the Petitioner came to her house that morning "to 'get a couple of drinks' on his way to work."  Lewis, 2013 WL 6199278, at *2.  Margaret testified at trial that the Petitioner did not say anything to her about having an altercation with the victim and that she did not see any injuries to the Petitioner.  Id.  However, Margaret told the investigators on three separate occasions that when the Petitioner arrived at her house that morning, he said that "the victim was mad at him" and "had hit him with a beer bottle."  Id.  Margaret also told the investigators that she "observed injuries to both of the [Petitioner's] arms and his neck."  Id.  Additionally, Margaret made similar statements to a 911 operator when she called to report the victim's death.  Id. at *4.

Margaret insisted that her testimony at trial was truthful and that her statements to the investigators were lies.  Lewis, 2013 WL 6199278, at *2.  Margaret could not explain why she had lied to the investigators other than to say that "the situation was 'stressful.'"  Id.  Margaret explained that "when things get bad and stressful," her "mind [was] like a tornado or a whirlwind" and she "just [does not] handle it well."  However, the investigator who questioned Margaret described her as being "'quite calm'" and that she "did not seem at all 'foggy' or unclear about the details."  Id. at *7.  On cross-examination, Margaret was asked if she had ever been under psychiatric care.  Margaret responded "[n]ot for several years, but [she was] now."

Margaret testified that the Petitioner left for work and did not return until "after dark" on the night of July 31, 2010.  Lewis, 2013 WL 6199278, at *3.  The Petitioner

---

[1] Judge James Curwood Witt, Jr., filed a dissenting opinion asserting that the evidence was insufficient to sustain the Petitioner's conviction for second degree murder.  Lewis, 2013 WL 6199278, at *20-24.

[2] We will refer to some witnesses by their first names because several witnesses share the same surname.  No disrespect is intended.

stayed the night at Margaret's home. Id. During the 911 call, Margaret told the 911 operator that the Petitioner stayed the night at her home to "'cool off'" from his earlier altercation with the victim. Id. at *4. The Petitioner spent the next day, August 1, 2010, at Margaret's home. Id. at *3. Late in the afternoon, the Petitioner went "home to check on the dogs and to get a Powerade." Id. The Petitioner returned a short time later "upset and crying." Id. The Petitioner told Margaret that "there was 'something wrong' with the victim and he thought she was dead." Id.

Margaret testified that the Petitioner asked her to go and check on the victim. Lewis, 2013 WL 6199278, at *3. Margaret found the victim's body lying on the floor of the bedroom. Id. Margaret was inconsistent in her testimony about the position of the victim's body when she discovered it. Margaret testified that the victim's body was lying on its back. She also testified that the victim's body was lying on its left side and that she "'pulled [it] over onto [its] back'" to see if the victim was alive. Id. at *3-4. Margaret returned to her home, told the Petitioner that the victim was dead, and called 911. Id. at *3. The Petitioner responded to Margaret by saying, "Mamma, they're probably going to think that I did it" because the victim was lying "over there dead." Id.

Margaret testified that the Petitioner stayed at her home until "'just . . . before'" the investigators pulled up her driveway. Lewis, 2013 WL 6199278, at *3. Additionally, Margaret stated on the 911 call that the Petitioner "had 'left' and she did not know where he went." Id. at *4. However, Margaret testified that the Petitioner "was not 'running' from [the] police, he 'had just left.'" Id. at *3. Margaret told the investigators that if she could have kept the Petitioner at her home "to talk to" them, she "sure would have." Id. When the first officers arrived, there was no one inside or "around the perimeter" of the Petitioner's trailer. Id. at *1. The officers entered the unlocked trailer and found the victim's body lying on its back "just inside the bedroom door." Id. A "'beer bottle [was] stuck in the wall' above where the victim was lying," and the bedroom was described as being "'in disarray.'" Id. at *5-6.

"[A]bout two hundred yards behind the [Petitioner's] trailer," the investigators discovered "a hole that was approximately four feet wide, ten feet long[,] and two and [a] half to three feet deep." Lewis, 2013 WL 6199278, at *6. Inside the hole was "a pile of dirt with a shovel lying on the pile." Id. A "front-end loader" was found in the front yard with "mud on the loader and . . . on the tires." Id. Investigators believed that the mud on the loader was "'fresh'" and that the mud on the tires appeared to be "'wet.'" Id. at *7. Based upon the appearance of the hole, the investigators believed it "to be a grave." Id. There were no animal bones found "anywhere in the area" of the hole. Id.

The Petitioner's cousin, Jason Beaty, testified that he was asked to help locate the Petitioner on the afternoon of August 1, 2010. Lewis, 2013 WL 6199278, at *10. Mr. Beaty "called the [Petitioner's] cellular phone approximately five times but received no

answer." Id. Around 10:00 or 11:00 p.m. that night, the Petitioner called Mr. Beaty "'crying and distraught.'" Id. According to Mr. Beaty, the Petitioner stated that "he and the victim were in an argument, the victim hit the [Petitioner], and then the [Petitioner] hit the victim before leaving." Id. Mr. Beaty testified that the Petitioner spent that night at Mr. Beaty's mother's house and that he went to see the Petitioner the next morning. Id. According to Mr. Beaty, the Petitioner again stated that he had an altercation with the victim before leaving the house on July 31, 2010. Id. Mr. Beaty "did not recall seeing any injuries on the [Petitioner] when he spoke with him." Id.

Evidence was also introduced at trial about a $400,000 life insurance policy on the victim. Lewis, 2013 WL 6199278, at *10. The Petitioner told the insurance agent, Chad Ownby, that "an argument had occurred between the [Petitioner] and [the] victim[,] . . . that the [Petitioner] stayed at his mother's house that night to 'cool off[,]'" and that the Petitioner found the victim dead when he returned to their home the next day. Id. Mr. Ownby testified that when payment of the policy was delayed due to the investigation of the victim's death, the Petitioner became "'increasingly frustrated and irate.'" Id. at *11. The Petitioner ultimately threatened Mr. Ownby saying, "'[Y]ou had better pay my f--king money tomorrow at this time at your location. If you don't do it there, I'm going to Brentwood to your corporate headquarters to get my f--king money." Id.

On August 2, 2010, an autopsy was performed on the victim's body by Doctor Thomas Deering. Lewis, 2013 WL 6199278, at *7-8. Dr. Deering "was unable to determine a specific cause of death." Id. at *8. Dr. Deering "was able to rule out gunshot, stabbing, blunt force trauma, strangulation, heart disease, lung disease, and cancer." Id. Dr. Deering testified that it was "possible [that the victim's] heart was enlarged" and that "a person with an enlarged heart 'can suffer from hypertension' and are 'at some risk' for a fatal heart rhythm, however he could not conclude that this was the cause of [the victim's] death." Id.

Dr. Deering testified that he could not rule out suffocation as a possible cause of death. Lewis, 2013 WL 6199278, at *9. Dr. Deering explained that suffocation was "always a difficult cause of death because it's something that can happen that leaves no sign or very, very subtle signs." Id. at *8. Dr. Deering noted that the victim's body "was moderately decomposed" and that the "subtle findings" that he would look for, such as "'petechiae eye,'" would have been "basically erased by the changes of decomposition." Id. However, Dr. Deering "confirmed that he did not find any medical proof that the victim's death was a homicide" and agreed that "a person who is heavier may experience more health problems due to their weight." Id. at *10.

Dr. Deering estimated that "the victim had been deceased for two to three days" at the time of the autopsy. Lewis, 2013 WL 6199278, at *9. Dr. Deering explained that "he could not determine the exact time of death for the victim." Id. Dr. Deering further

explained that, generally, "heat can speed up the process of decomposition and that a larger person retains body heat which accelerates the decomposition process." Id. Conversely, "a person in a cool environment may exhibit signs of slower decomposition." Id. Dr. Deering's estimated time of death was based on his experience and "all the circumstances of this case." Id. Dr. Deering also opined that the victim's body had been moved. Id. at *9-10. Dr. Deering noted that lividity, the pooling of blood in a person's body after their death, had become fixed on the victim's left side. Id. at *9. This suggested to Dr. Deering that the victim's body was "on her left side 'for a number of hours' before she was moved." Id.

The Petitioner and the victim's seventeen-year-old son testified on behalf of the Petitioner at trial that the hole in the backyard "was dug approximately a month and a half to two months before his mother's death." Lewis, 2013 WL 6199278, at *11. He explained "that the hole had been dug to bury two or three dogs that had died," that both the Petitioner and the victim had dug the hole, and that "they did not fill the hole after digging it because they planned to use the dirt to make a 'berm' on his dirt bike track." Id. He further stated that a stump had been removed from that area and "'should be around the grave somewhere.'" Id. at *12. He also stated that "his maternal grandparents took his cellular telephone from him"; therefore, he was unsure if the Petitioner had tried to contact him "on his cellular phone after his mother died." Id.

The Petitioner and the victim's fourteen-year-old daughter testified that both of her parents dug the hole in the backyard "'a while before [the victim] died.'" Lewis, 2013 WL 6199278, at *11 (alteration in original). She explained that "there was a stump in the bike path where the family rode four-wheelers" and estimated that the hole was "dug two weeks before the weekend her mother died." Id. She admitted that the Petitioner "did not tell her of her mother's death until 'a couple of days before her funeral.'" Id.

## II. Post-Conviction Proceedings

Linda Beaty testified that she was the Petitioner's aunt and Mr. Beaty's mother. Ms. Beaty testified that after the victim's body was discovered, the Petitioner got in the victim's van "and went riding around by himself." Ms. Beaty did not find this behavior to be unusual. Ms. Beaty explained that in 1994, the victim and the Petitioner's "first child was born premature and he passed away" at the hospital. According to Ms. Beaty, the Petitioner responded to the baby's death by "riding around for a while" "to get away." Ms. Beaty believed that the Petitioner's behavior after the victim's death was consistent with his behavior after the death of his and the victim's first child.

According to Ms. Beaty, the Petitioner met her after the victim's body was discovered and wanted her to go with him to the Putnam County Sheriff's Office "to give

his statement." Ms. Beaty testified that she called trial counsel and that trial counsel advised the Petitioner not to go to the Sheriff's Office or speak to the investigators without him. So Ms. Beaty took the Petitioner to her home where he spent the night. Ms. Beaty recalled that the Petitioner "was very upset" and crying when she met him on August 1, 2010. Ms. Beaty also recalled that the Petitioner attempted to call his children, but that he could not get ahold of them. Ms. Beaty did not recall seeing any injuries to the Petitioner that day. Ms. Beaty testified that the next morning she took the Petitioner to trial counsel's office and that trial counsel said that he would take the Petitioner to the Sheriff's Office. Ms. Beaty recalled that the Petitioner stayed at her house for a total of three nights.

Ms. Beaty also testified about the Petitioner's mother, Margaret. Ms. Beaty admitted that she had been "estranged" from Margaret since 2003. Ms. Beaty claimed that after the death of the Petitioner and the victim's first child in 1994, she found Margaret bathing the baby's corpse. Ms. Beaty further claimed that Margaret dressed the baby's corpse and took it with her to run errands. Ms. Beaty was unsure how Margaret got the baby's corpse from the hospital. Ms. Beaty also claimed that Margaret had threatened to remove their father from a hospital intensive care unit and take him home with her in 2003. Ms. Beaty testified that she asked trial counsel to call her as a witness at trial to testify about the Petitioner and Margaret's behavior, but that trial counsel told her that her testimony would be irrelevant and inadmissible.

Kimmer Lodes testified that she was the Petitioner's sister. Like Ms. Beaty, Ms. Lodes testified that the Petitioner "dr[o]ve around" alone after the death of his first child in 1994. Ms. Lodes also testified about Margaret's behavior after the baby's death. According to Ms. Lodes, Margaret clothed the baby's corpse and took it with her to run errands. Ms. Lodes believed that the Petitioner and the victim had brought the baby's corpse home from the hospital and that Margaret was able to get access to it prior to the baby's funeral. Ms. Lodes claimed that Margaret "started screaming hysterically" and tried to prevent dirt from being put in the baby's grave during the burial. Ms. Lodes further claimed that Margaret "hitchhiked" to the hospital in an attempt to see the baby the day after his burial.

Similarly, Ms. Lodes testified that Margaret "was very angry" and "erratic" after the death of Margaret's mother. Ms. Lodes explained that Margaret became fixated on not letting a woman attend her mother's funeral. Ms. Lodes admitted that she was not present on the day that the victim's body was discovered. However, Ms. Lodes claimed that Margaret was "erratic" on the phone with her and that their conversation "left [her] not even knowing if [the victim] was dead." Ms. Lodes recalled that Margaret was "distraught and upset" when she spoke with her the day after the victim's body was discovered.

-6-

Ms. Lodes testified that she provided trial counsel with a written list of Margaret's odd behavior over the years. Ms. Lodes also provided trial counsel with "weather reports" for the weekend of the victim's death. Ms. Lodes testified that she hired an expert, Doctor Randall Pedigo, to review the autopsy report on the victim's body. Ms. Lodes also testified that she encouraged trial counsel to call the Petitioner's cousin, Charles Johnson, as a witness at trial to testify about the hole found in the Petitioner's backyard. Ms. Lodes further testified that she encouraged trial counsel to take additional pictures of the hole.

Mr. Johnson testified that he was the Petitioner's cousin and that he lived approximately a mile from the Petitioner and the victim's trailer. Mr. Johnson admitted that he did not see the hole in the Petitioner's backyard being dug. However, Mr. Johnson testified that he borrowed the front-end loader from the Petitioner. Mr. Johnson testified that he saw the hole when he returned the front-end loader.

According to Mr. Johnson, the hole was three feet deep and four feet wide. Mr. Johnson was told that the hole was a grave for the Petitioner's dogs. Mr. Johnson recalled that there were "stumps around" the hole, but he also noted that the Petitioner lived in "a wooded area." Mr. Johnson estimated that he saw the hole approximately a month before the victim died.

Mr. Johnson testified that the temperature was around ninety-five degrees on the day that the victim's body was found. Mr. Johnson also testified that the Petitioner and the victim's trailer did not have any air conditioning. Mr. Johnson stated that trial counsel never spoke to him and that he was not called as a witness at the Petitioner's trial.

Tommy Lewis testified that he was the Petitioner's cousin and that, in 2005, he was an insurance sales agent with "American General." Tommy testified that he contacted the Petitioner about purchasing life insurance and that the Petitioner and the victim eventually purchased life insurance policies for themselves and their children. At the time of the victim's death, Tommy was no longer employed with American General. Tommy did not know Mr. Ownby and did not know if the Petitioner ever received payment from the victim's insurance policy.

Dr. Pedigo testified that he "was the Chief Medical Examiner for Knox County from 1982 to about 1994," but that he was no longer "in the active practice of medicine."[3]

---

[3] Dr. Pedigo's license to practice medicine in Tennessee was revoked in the mid-1990s after he pled guilty "to multiple counts of illegal dispensing of a controlled substance and sexual battery." Pedigo v. UNUM Life Ins. Co. of Am., 145 F.3d 804, 806 n.1 (6th Cir. 1998). Dr. Pedigo was also "unable to practice surgery" because he had been shot seven times by a law enforcement officer. Id. at 806. Dr. Pedigo was shot after pointing a gun at the officer when law enforcement arrived at his home to question Dr. Pedigo about the allegation that Dr. Pedigo "had drugged and molested a teenage boy at the doctor's

At the time of the victim's death in 2010, Dr. Pedigo "consulted with attorneys on a regular basis, but [he] had to testify [in court] very rarely." Dr. Pedigo recalled that he was retained by either the Petitioner's family or trial counsel to review the autopsy report on the victim's body. Dr. Pedigo testified that he discussed his findings with trial counsel. However, Dr. Pedigo stated that "test[ifying] at trial was never discussed with anyone," and he "did not expect to be called" as a witness at trial. However, Dr. Pedigo stated that he would have testified if he had been subpoenaed.

Dr. Pedigo testified that Dr. Deering was "a well-trained[,] competent, [and] conscientious forensic pathologist," and he agreed with Dr. Deering's finding that "it was impossible in this case to determine the cause of death." Dr. Pedigo continued, stating that he believed that Dr. Deering's findings in the autopsy report were "accurate, complete[,] and correct." Dr. Pedigo acknowledged that Dr. Deering had "a tremendous advantage over" him because Dr. Deering conducted the autopsy and had actually viewed the victim's body. Overall, Dr. Pedigo did not "believe that there [was] any difference at all in [his] opinions and those opined by Dr. Deering at trial."

Dr. Pedigo testified that he stated in his one-page "report" that the victim suffered from sleep apnea and that sleep apnea could lead to sudden and unexplained death. However, Dr. Pedigo admitted that the victim's diagnosis of sleep apnea was provided to him by the Petitioner's family and not from any of the victim's medical records. Dr. Pedigo opined that the victim was not suffocated because he saw no physical evidence of suffocation in the autopsy report and it would be difficult to suffocate someone lying on their side like the victim was when she died. Dr. Pedigo denied ever telling trial counsel that it was his opinion that the victim had been suffocated.

The Petitioner testified that he wanted trial counsel to call Ms. Beaty as a witness at trial to explain that he did not flee from the police. The Petitioner explained that the police "knew where [he] was . . . the whole time" because they "followed [him] everyplace [he] went." The Petitioner further explained that he "like[d] to drive" and that he "just drove around" after the victim's body was discovered. The Petitioner testified that he was going to go to the Sheriff's Office to speak with the investigators, but that Ms. Beaty told him not to based on trial counsel's advice.

The Petitioner testified that he wanted trial counsel to call Ms. Lodes as a witness at trial to testify about "[h]ow [Margaret] does not act rationally." The Petitioner explained that he believed this testimony would discredit Margaret's repeated statements that he "was all scratched up and everything" when she saw him on July 31, 2010.

---

condominium." Id.

The Petitioner testified that he wanted trial counsel to call Mr. Johnson to testify about the hole in his backyard because "they said it was a freshly dug hole." The Petitioner asserted that Mr. Johnson knew the hole was a month old when the victim died. The Petitioner testified that he started digging the hole to remove a stump and that the victim finished digging the hole. The Petitioner admitted that trial counsel called two of his children to testify about the hole and that he did not have an issue with the children testifying at trial.

The Petitioner testified that he wanted trial counsel to call Tommy as a witness to testify about the life insurance policy because "they said [he did] it for a life insurance policy." The Petitioner wanted Tommy to testify to show that they had the life insurance policy "a whole lot longer" than three years. The Petitioner claimed that he was never told that there was a possibility the life insurance company would not pay out on the victim's policy and that he got angry at Mr. Ownby because "they raised [his] premiums up." The Petitioner testified that the life insurance company paid him the total amount of the $400,000 policy on the victim despite his conviction.

The Petitioner testified that he expected Dr. Pedigo to testify at trial. However, trial counsel informed him at trial that Dr. Pedigo would not testify. The Petitioner claimed that trial counsel never told him the reason why he did not call Dr. Pedigo as a witness at trial.

The Petitioner admitted that he met with trial counsel at least fifteen times prior to trial. The Petitioner also admitted that he told the trial court during the trial proceedings that he was satisfied with trial counsel's representation. The Petitioner further admitted that he did not complain to the trial court or trial counsel about the fact that none of these witnesses were called at trial. The Petitioner explained that he did not complain because he "thought [trial counsel] knew what he was doing."

Trial counsel testified, with respect to Ms. Beaty and Ms. Lodes, that Margaret "just flat out lied and told two completely different stories" at trial in order to protect the Petitioner. Trial counsel did not want the Petitioner's family "up here trying to justify what" Margaret had said to the police. Trial counsel explained that he was worried that the jury would think that they were lying to protect the Petitioner like Margaret appeared to be doing. He also did not want Ms. Beaty and Ms. Lodes to be subject to cross-examination by the State. Additionally, trial counsel testified that he did not believe that their testimony regarding Margaret was relevant or admissible because there were no medical records or other evidence suggesting that Margaret had "ever been declared incompetent." Trial counsel asserted that he explained all of this to the Petitioner.

Trial counsel did not recall being told about Mr. Johnson. However, trial counsel believed that the Petitioner's children were "very sympathetic and made pretty good

witnesses." Additionally, trial counsel testified that he would not have called Mr. Johnson as a witness because he did not want Mr. Johnson to contradict the timeline established by the children. Trial counsel feared that such a contradiction would make the children look like liars to the jury. Trial counsel also worried about calling too many of the Petitioner's family members at trial. Trial counsel testified that he did not take any additional pictures of the hole because the Petitioner told him that the State's photographs "accurately reflected what the hole looked like." Trial counsel further testified that he did not want to over emphasize the hole at trial.

Trial counsel testified that he did not believe that introducing "weather reports" or other testimony about the temperature on the day the victim's body was discovered would have changed the outcome of the Petitioner's trial. Trial counsel noted that Dr. Deering testified that heat could speed up the decomposition process and that "[e]verybody testified it was blazing hot in the trailer and . . . outside."

Trial counsel testified that he did not think that Tommy's testimony would have changed the outcome of the Petitioner's trial. Trial counsel noted that the insurance policy was introduced into evidence at trial and that the jury could see that it had been issued five years before the victim's death rather than three years. Trial counsel did not believe that the difference in time mattered "that much" anyway. Trial counsel stated that "the issue . . . was [the Petitioner's] erratic behavior after [the victim] had passed away . . ., cussing [Mr. Ownby] and threatening [him]." Tommy could not testify about the Petitioner's interactions with Mr. Ownby.

Trial counsel testified that Ms. Lodes hired Dr. Pedigo and put him in contact with Dr. Pedigo. Trial counsel claimed that he researched Dr. Pedigo's background, that Dr. Pedigo's "credentials were long and good," and that he found nothing in Dr. Pedigo's background that concerned him other than "an issue about whether [Dr. Pedigo] was actually practicing or doing whatever." Trial counsel testified that he "was ecstatic" when he got Dr. Pedigo's "report." Trial counsel initially believed that Dr. Pedigo's testimony would help the Petitioner's case "even though he was going to agree with everything that Dr. Deering said."

However, trial counsel claimed that he asked Dr. Pedigo what his response would be if asked by the State how the victim died and that Dr. Pedigo responded that he would "have to say she was smothered." Trial counsel testified that he could not call Dr. Pedigo as a witness if he was going to testify that the victim was smothered. Trial counsel claimed that this was the sole reason why he did not call Dr. Pedigo as a witness at trial and that he explained his reasoning to the Petitioner. Trial counsel testified that ultimately he did not think Dr. Pedigo's testimony "would have added anything to the trial" because Dr. Pedigo's testimony would have been the same as Dr. Deering's. Trial

counsel noted that Dr. Deering "made a great witness for" the defense because he "couldn't testify [that] it was a homicide."

At the conclusion of the evidentiary hearing, the post-conviction court stated that it "put great confidence in the testimony of" trial counsel. The post-conviction court also stated that trial counsel's cross-examination of Dr. Deering "produced a very good result for" the Petitioner and that it did not see how Dr. Pedigo's testimony would have benefited the Petitioner at trial. On June 1, 2017, the post-conviction court entered a written order denying post-conviction relief. The post-conviction court concluded that the testimony of each of the witnesses presented at the evidentiary hearing would not have materially aided the Petitioner's defense at trial. The post-conviction court also concluded that trial counsel's decision not to present further evidence regarding the hole in the Petitioner's backyard was based on his desire not to overemphasize the hole and that this was a valid strategic decision. The post-conviction court further concluded that the Petitioner failed to present any proof as to how the presentation of "weather reports" for the weekend of the victim's death would have changed the outcome of his trial.

## ANALYSIS

The Petitioner contends that the post-conviction court erred in denying post-conviction relief. The Petitioner argues that trial counsel was ineffective for failing to call at trial Ms. Beaty and Ms. Lodes to explain the Petitioner's "unusual behavior following his wife's death," Ms. Beaty and Ms. Lodes to testify about Margaret's "erratic and irrational behavior in stressful situations," Mr. Johnson to testify about "the origin" of the hole in the Petitioner's backyard, Tommy to testify about "the motivation and timing of [the] life insurance policy," and Dr. Pedigo to testify that the victim "may have died of natural causes." The Petitioner also argues that trial counsel was ineffective for failing to "offer additional evidence" regarding the hole in the Petitioner's backyard and for failing to "introduce evidence of the weather during the weekend of the [victim's] death." The State responds that the post-conviction court did not err in denying the petition.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

-11-

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

When a petitioner alleges that trial counsel was ineffective for failing to call a witness at trial and that witness has been presented at the post-conviction hearing, "the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." Plyant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). A finding that "trial counsel was not deficient in failing to call [a] witness at trial" is justified if "the post-conviction court determine[d] that the proffered testimony would not have been admissible at trial or that . . . it would not have materially aided the petitioner's defense at trial." Id. "[I]f the proffered testimony [was] both admissible and material, the post-conviction court must assess whether the witness [was] credible." Id. at 869-70. However, the decision of what witnesses to call at trial is a strategic and tactical decision to be made by trial counsel and which we "will not second-guess" if it was an informed decision. Id. at 873-74.

With respect to the testimony of Ms. Beaty and Ms. Lodes about the Petitioner's "unusual behavior following his wife's death," trial counsel testified that he was concerned about calling too many of the Petitioner's family members at trial because he was afraid that the jury would believe that they were lying to protect the Petitioner. Specifically, trial counsel worried that the jury would think Ms. Beaty and Ms. Lodes

-12-

were lying to protect the Petitioner like Margaret had appeared to do during her testimony. Trial counsel also did not want Ms. Beaty and Ms. Lodes to be subjected to cross-examination by the State. Testimony about the Petitioner's having "[driven] around" after the death of his first child in 1994 would have "opened the door" for the State to introduce possible evidence of the Petitioner's bad character. See Tenn. R. Evid. 404(a)(1).

Similarly, as the State notes in its brief, it was reasonable for trial counsel to avoid presenting testimony that "the [P]etitioner chose to 'lawyer up'" rather than speak to the investigators after the victim's body was discovered. Additionally, Margaret testified that the Petitioner "was not 'running' from [the] police." Lewis, 2013 WL 6199278, at *3. Instead, she testified that the Petitioner "'had just left.'" Id. Regarding the Petitioner's failure to contact his children, there was testimony that the children had their cell phones confiscated by their maternal grandparents after the victim's death. With respect to Ms. Beaty's testimony that she did not observe any injuries to the Petitioner, Mr. Beaty already testified at trial that he did not observe any injuries to the Petitioner on the morning of August 2, 2010. For these reasons, trial counsel made an informed strategic and tactical decision not to call Ms. Beaty and Ms. Lodes to testify regarding the Petitioner's actions after the victim's death.

Regarding Ms. Beaty and Ms. Lodes's testimony about Margaret's "erratic and irrational behavior in stressful situations," "[a] party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony." Tenn. R. Evid. 617. However, "[o]nly impaired capacity at 'occurrence or testimony' will impeach." Tenn. R. Evid. 617, Advisory Comm'n cmt. As such, Ms. Beaty and Ms. Lodes's testimony about Margaret's history of "erratic and irrational behavior in stressful situations" would have been irrelevant and inadmissible at trial. Moreover, their testimony would not have been material to the Petitioner's defense at trial in light of the fact that Margaret testified that she did not handle stressful situations well, that her "mind [was] like a tornado or a whirlwind" when she spoke to the investigators, and that she was under psychiatric care at the time of trial.

Mr. Johnson's testimony about the "origin" of the hole in the backyard would not have been material to the Petitioner's defense at trial. Mr. Johnson testified that the hole was approximately a month old at the time of the victim's death. Trial counsel called two of the Petitioner and the victim's children to testify about the hole. Trial counsel believed that the children were "very sympathetic and made pretty good witnesses." One child testified that the hole "was dug approximately a month and a half to two months" and the other testified that it was dug "a while before [the victim] died." Lewis, 2013 WL 6199278, at *11-12. One of the children testified that the hole was "dug two weeks before her mother died," which was shorter than Mr. Johnson's estimation of a month.

-13-

Id. at *11. A timeframe of two weeks was still contrary to the State's theory that the hole was freshly dug and the testimony of the investigators that the mud on the front-end loader was "'fresh'" and "'wet.'" Id. at * 7. Accordingly, trial counsel was not deficient for failing to call Mr. Johnson at trial.

Tommy's testimony about the life insurance policy also would not have been material to the Petitioner's defense at trial. There was some confusion about the age of the policy. This court's opinion on direct appeal states that it was three years old at the time of the victim's death. Lewis, 2013 WL 6199278, at *11. Tommy testified that the policy was five years old. However, trial counsel noted that the life insurance policy was introduced into evidence at trial and that the jury could see on the policy itself the date that it was issued. Moreover, as trial counsel pointed out, "the issue . . . was [the Petitioner's] erratic behavior after [the victim] had passed away . . ., cussing [Mr. Ownby] and threatening [him]." Tommy was no longer employed with the insurance company at the time of the victim's death and could not testify about the Petitioner's interactions with Mr. Ownby. Accordingly, trial counsel was not deficient for failing to call Tommy at trial.

Dr. Pedigo's testimony was likewise not material to the Petitioner's defense at trial. Trial counsel testified that he decided not to call Dr. Pedigo after Dr. Pedigo told him that, if asked by the State how the victim died, that he would "have to say she was smothered." Dr. Pedigo denied making this statement, but the post-conviction court accredited trial counsel's testimony. Testimony by Dr. Pedigo that the victim "was smothered" would have been extremely damaging to the Petitioner's defense. More importantly, trial counsel was not deficient for failing to call Dr. Pedigo at trial given Dr. Pedigo's background, the fact that Dr. Pedigo did not "believe that there [was] any difference at all in [his] opinions and those opined by Dr. Deering at trial," and the fact that the statement that the victim suffered from sleep apnea found in Dr. Pedigo's one-page "report" was based on the medical history provided by the Petitioner's family and not on any of the victim's medical records.

Regarding the Petitioner's argument that trial counsel was ineffective for failing to "offer additional evidence" about the hole in the Petitioner's backyard, trial counsel testified that he did not take additional pictures of the hole because the Petitioner told him that the State's photographs "accurately reflected what the hole looked like." Additionally, two of the Petitioner's children testified at trial about the reason the hole was dug and that the victim participated in digging the hole. Trial counsel testified that he did not want to put on further evidence about the hole for fear of over-emphasizing its existence. The decision to limit the evidence about the hole was a tactical choice made by trial counsel. When a trial counsel's tactical choices are informed and made with adequate preparation, this court does not measure them with "20-20 hindsight" or "sit to

-14-

second guess . . . [those] choices made by trial counsel." Hellard v. State, 629 S.W.2d 4, 10 (Tenn. 1982) (internal quotation marks omitted) (quoting United States v. DeCoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973)). Accordingly, we conclude that the post-conviction court did not err in denying post-conviction relief on this issue.

Finally, the Petitioner argues that trial counsel was ineffective for failing to "introduce evidence of the weather during the weekend of the death." Ms. Lodes testified that she provided "weather reports" for the weekend of the victim's death to trial counsel. Mr. Johnson testified that the Petitioner and the victim's trailer did not have air conditioning and that it was approximately ninety-five degrees outside on the day the victim's body was discovered. However, the Petitioner presented no evidence at the post-conviction hearing as to how this information would have changed or differed from Dr. Deering's estimated time of death for the victim.

Trial counsel testified that during the trial "[e]verybody testified it was blazing hot in the trailer and . . . outside." Dr. Deering admitted that "he could not determine the exact time of death for the victim." Lewis, 2013 WL 6199278, at *9. He explained, generally, that heat can accelerate the decomposition process while cold can slow the process down. Id. Dr. Deering estimated that "the victim had been deceased for two or three days" at the time of the autopsy based upon his expertise and "all the circumstances of this case." Id. This was consistent with the fact that the victim did not show up for work on the morning of July 31, 2010. Id. at *5. As such, the Petitioner failed to establish that he was prejudiced by trial counsel's failure to "introduce evidence of the weather during the weekend of the [victim's] death."

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-15-